IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HIPPOCRATIC GROWTH MARYLAND PROCESSING, LLC *et al.*, | )<br>)<br>) |
| Plaintiffs/Counter-Defendants, | ) Civil Action No. 22-cv-00090-LKG<br>)<br>) Dated: December 19, 2023 |
| v. | )<br>) |
| MICHAEL PESCE, | )<br>) |
| Defendant/Counter-Plaintiff. | )<br>) |

**MEMORANDUM OPINION**

**I.      INTRODUCTION**

In this breach of contract action, Plaintiffs, Hippocratic Growth Maryland Processing, LLC ("Hippocratic") and TC Maryland, Inc. ("TC Maryland"), allege that Defendant, Michael Pesce, breached a Stock Purchase Agreement that would have allowed Hippocratic to manage a Maryland medical cannabis processor. *See generally*, ECF No. 47.  Hippocratic has moved to dismiss Mr. Pesce's counterclaims for breach of contract (recission) and declaratory judgment, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF Nos. 41, 41-1, 54 and 54-1.  This motion is fully briefed.  ECF Nos. 42, 43, 55 and 57.  No hearing is necessary to resolve the motion. *See* L.R. 105.6 (D. Md. 2021).  For the reasons that follow, the Court: (1) **GRANTS** Hippocratic's motion to dismiss Mr. Pesce's counterclaims and (2) **DISMISSES** Mr. Pesce's counterclaims in this matter.

**II.     FACTUAL AND PROCEDURAL BACKGROUND**[1]

      **A.     Factual Background**

In this breach of contract action, Hippocratic alleges that Michael Pesce breached a Stock

---

[1] The facts recited in this memorandum opinion are taken from the amended complaint (ECF No. 47); Mr. Pesce's answer, affirmative defenses and counterclaims (ECF No. 48); Hippocratic's motion to dismiss

Purchase Agreement (the "SPA") pursuant to which Hippocratic acquired 90 percent of the shares of TC Maryland and the ability to manage Pro Green Medical, LLC ("Pro Green"), a pre-approved Maryland medical cannabis processor. ECF No. 47 at ¶¶ 1-2; *see* ECF No. 11-2, Stock Purchase Agreement. Specifically, Hippocratic alleges that Mr. Pesce breached the SPA by refusing to communicate with the Maryland Medical Cannabis Commission (the "MMCC") about an application to transfer the management of Pro Green to Hippocratic. ECF No. 47 at ¶¶ 25-26, 31. As relief, Hippocratic seeks to recover monetary damages from Mr. Pesce. *Id.* at ¶¶ 60, 66.

The SPA

As background, Hippocratic is a Maryland limited liability company that currently has a controlling interest in TC Maryland. *Id.* at ¶¶ 10, 18, 42. Michael Pesce was, from its formation until January 17, 2023, an officer and director of TC Maryland and he also serves as the LLC Manager of Pro Green. *Id.* at ¶¶ 1, 16.

On February 18, 2021, Hippocratic and Mr. Pesce executed the SPA, pursuant to which Hippocratic acquired 90 percent of the shares of TC Maryland. *Id.* at ¶¶ 1, 15. At the time of this transaction, TC Maryland held an option to purchase 100 percent of the membership interests in Pro Green, an entity that is a licensed medical cannabis processor in the State of Maryland.[2] *Id.* at ¶¶ 1-2.

Central to the parties' agreement was their plan to transfer the management of Pro Green to Hippocratic. *See* ECF No. 11-2, Stock Purchase Agreement at 7. To that end, Hippocratic agreed to pay Mr. Pesce $5,400,000.00, to provide additional funding to make Pro Green

---

Pesce's counterclaims (ECF No. 41); the memorandum in support thereof (ECF No. 41-1); Mr. Pesce's response in opposition thereto (ECF No. 42); Pesce's memorandum in support thereof (ECF No. 42-1); Hippocratic's reply in support of its motion to dismiss (ECF No. 43); Hippocratic's memorandum in support thereof (ECF No. 43-1); Hippocratic's renewed motion to dismiss (ECF No. 54); Hippocratic's memorandum in support thereof (ECF No. 54); Mr. Pesce's response in opposition thereto (ECF No. 55); Pesce's memorandum in support thereof (ECF No. 55-1); Hippocratic's reply in support of its renewed motion to dismiss (ECF No. 57); and Hippocratic's memorandum in support thereof (ECF No. 57-1). Unless stated otherwise, the facts contained herein are undisputed.

[2] A medical cannabis processing license entitles the processor to manufacture usable medical cannabis into medical cannabis concentrates or to manufacture medical cannabis-infused products (including edible cannabis products). ECF No. 47 at ¶ 2.

operational and to provide a revolving line of credit for Pro Green's operating expenses. *Id.* at 3, 13; *see also* ECF No. 47 at ¶ 18.

Article VII of the SPA addresses termination of this agreement and Section 7.01 of the SPA provides that:

### ARTICLE VII

### TERMINATION

**Section 7.01 Notice of Default and Period to Cure.** The Parties shall each devote all necessary time, attention and resources (financial or otherwise) to ensure that the Company obtains the MMCC Final Approval and Dispensary License by fulfilling their post-closing covenants and obligations.

(a) If the Owner fails to satisfy (i) all post-closing covenants in Section 5.06 of this Agreement, or (ii) any other obligations under this Agreement and the Transaction Documents, Purchaser shall provide a written notice detailing the breach and requesting a meeting or conference call with the Owner for an explanation as to why the covenants and obligations have not been timely satisfied and how the Owner plans to fulfill his covenants and obligations within seven (7) Business Days after the meeting ("**Owner Cure Period**"). The meeting or conference call shall be scheduled within no more than two (2) business days after the notice.

(b) If the Purchaser fails to satisfy all post-closing covenants in Sections 5.01, 5.02, 5.03, 5.04 and 5.05 and all other obligations under this Agreement and the Transaction Documents, the Owner shall provide written notice detailing the breach and requesting a meeting or conference call with the Purchaser for an explanation as to why the covenants and obligations have not been timely satisfied and how the Purchaser plans to fulfill all of its covenants and obligations within seven (7) Business Days after the meeting **("Purchaser Cure Period")**. The meeting or conference call shall be scheduled within no more than two (2) Business Days after the notice.

ECF No. 11-2, Stock Purchase Agreement at 19-20 (emphasis in original). It is undisputed that Hippocratic did not provide the notice described in Section 7.01(a) before it commenced this litigation. *See* ECF No. 28-1 at 8; ECF No. 31-1 at 5-7.

Sections 7.02 and 7.03 of the SPA further provide that:

> **Section 7.02 Termination of Agreement.** At any time prior to the MMCC Final Approval and upon written notice to the other Party, this Agreement may be terminated as follows:
>
> 1. if, seven (7) Business Days after the expiration of the Owner Cure Period under 7.01(a), the Owner has not cured his breach of the post-closing covenants in this Agreement, the Purchaser may terminate this Agreement;
> 2. if, seven (7) Business Days after the expiration of the Purchaser Cure Period under 7.01(b), Purchaser has not cured its breach of the post-closing covenants in this Agreement, Seller Representative may terminate this Agreement;
> 3. by the mutual written consent of the Owner and Purchaser;
> 4. by Owner and Purchaser if there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; and
> 5. by Owner or Purchaser if any Governmental Body shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Body shall have become final and non-appealable.
>
> **Section 7.03 Effect of Termination.**
>
> (a) The Parties' termination rights under Section 7.02 are in addition to their rights under this Agreement or otherwise, and the exercise of any termination right will not be an election of remedies.
> (b) Nothing herein shall relieve any Party hereto from liability for any intentional breach of any provision hereof.

ECF No. 11-2, Stock Purchase Agreement at 20.

Lastly, Section 8.13 of the SPA addresses specific performance and provides that:

> **Section 8.13 Specific Performance**. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached and that each party hereto shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of the provisions hereof and to enforce specifically the terms and provisions hereof, without the proof of actual damages, in addition to any other remedy to which they are entitled at law or in equity. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy, and agrees that it will not oppose the granting of an injunction, specific performance or other

equitable relief on the basis that (a) the other party has an adequate remedy at law, or (b) an award of specific performance is not an appropriate remedy for any reason at law or equity[.]

*Id.* at 23.

### The Application For Transfer

The MMCC must provide prior approval for the transfer of management control and ownership for any licensed cannabis company. *See* Md. Code Ann., Health-Gen. § 13-3309 (stating requirements for licensure of medical cannabis processors). And so, on March 16, 2021, Mr. Pesce submitted an application for the transfer of management control of Pro Green to the MMCC. ECF No. 47 at ¶ 22.

The effort to transfer the management of Pro Green to Hippocratic was short-lived. On December 27, 2021, Mr. Pesce sent a notice of default to Hippocratic that alleged multiple breaches of the SPA by Hippocratic.[3] *Id.* at ¶ 29. On December 29, 2021, the parties met and conferred, but they were unable to resolve this dispute. *Id.* at ¶ 32.

On January 11, 2022, the MMCC informed Hippocratic that Mr. Pesce told the Commission that Pro Green no longer intended to transfer control of its management to Hippocratic. *Id.* at ¶ 33; *see also* ECF No. 31-3. And so, the MMCC advised Hippocratic that the proposed management agreement would not be considered further, because the licensee had rescinded the request to transfer control. ECF No. 47 at ¶ 33. Hippocratic contends that Mr. Pesce violated his obligation under the SPA to take all acts reasonably necessary to "give effect to the transactions contemplated" by the SPA, by rescinding the application for the transfer of management of Pro Green. ECF No. 1 at ¶¶ 25-26.

### Mr. Pesce's Efforts To Rescind The SPA

Relevant to the pending motion to dismiss, on January 24, 2022, Mr. Pesce sent a letter to

---

[3] In his notice, Mr. Pesce stated that Hippocratic was in default under Sections 5.02-5.04 of the SPA and that he requested a conference call with Hippocratic pursuant to Section 7.01 of the SPA. ECF No. 34 at ¶¶ 37, 39-40; ECF No. 11-2 at 14, 19-20. Conversely, Hippocratic claims these breaches of the contract alleged by Mr. Pesce were baseless and part of a "ruse" orchestrated by Mr. Pesce to get out of his contract with Hippocratic. ECF No. 47 at ¶¶ 28-29. Hippocratic alleges Mr. Pesce had already negotiated a more lucrative deal with another cannabis operator to replace Hippocratic as Pro Green's financial backer. *Id.* at ¶ 27. Mr. Pesce admits he had "discussions with another cannabis licensee," but claims he did so due to Hippocratic's alleged inability to provide funding by late 2021. ECF No. 48 at ¶ 6.

Hippocratic providing "formal notice" that the SPA is terminated pursuant to Section 7.02(b) of that agreement. ECF No. 41-4. Although the parties attempted to reach an agreement by which Mr. Pesce would restore Hippocratic to the status quo, and thereby effectuate the SPA's recission, Mr. Pesce lacked the funds to immediately pay Hippocratic back. ECF No. 47 at ¶¶ 34-35; ECF No. 48 at ¶¶ 14, 20 n.4.

On February 23, 2022, Hippocratic filed a Complaint for Confessed Judgment against Pro Green in the Circuit Court for Frederick County, Maryland, based upon an alleged default with respect to the revolving line of credit Note entered into by Pro Green and Hippocratic. ECF No. 34 at ¶ 48; ECF No. 48 at ¶ 16. The circuit court entered an order of confessed judgment against Pro Green on February 28, 2022. ECF No. 34 at ¶ 50; ECF No. 48 at ¶ 17. But, on March 25, 2022, the circuit court entered an order vacating the order of confessed judgment, ending Hippocratic's efforts to enforce the judgment. ECF No. 34 at ¶¶ 51-52, 72; ECF No. 48 at ¶ 19. Mr. Pesce alleges that Hippocratic's legal actions interfered with his potential business deals that would have allowed him to raise the funds necessary to re-pay Hippocratic. ECF No. 48 at ¶¶ 18-20.

On September 12, 2022, the TC Maryland Board of Directors voted to issue additional shares of stock, thereby, diluting Mr. Pesce's ownership interest in TC Maryland. ECF No. 47 at ¶¶ 41-42. On September 15, 2022, Mr. Pesce sent a letter to Hippocratic stating that the SPA and ancillary documents had been rescinded and that:

> I am **not** waiving any claims or rights with respect to recission. I am expressly reserving all rights to pursue any and all rights or remedies afforded me under the SPA and related Transaction documents, including but not limited to, my previously exercised right to rescind the SPA.

ECF No. 41-2 (emphasis in original). Mr. Pesce also states in this letter that Hippocratic violated the SPA by issuing additional stock on behalf of TC Maryland. *Id.*

On October 20, 2022, Mr. Pesce, by and through counsel, sent a letter inquiring about whether Hippocratic intended to deposit the remaining sum due under the SPA. ECF No. 41-3. This letter further states, in relevant part, that "Mr. Pesce continues to maintain that the SPA and all related instruments have been terminated and are subject to recission. He reserves all rights, claims, remedies, and defenses in connection with this matter." *Id.*

It is undisputed that Mr. Pesce continued to operate Pro Green from at least January 25, 2022, to December 20, 2022.[4] *See* ECF No. 41-1 at 2; ECF No. 42-1 at 9; *see also* ECF No. 47 at ¶¶ 8, 36. Mr. Pesce also acknowledges that Pro Green did not have a "fully equipped processing facility" prior to the execution of the SPA, and that Hippocratic paid him to build a fully functional processing facility, acquire the necessary equipment, and provide additional operational expenses. ECF No. 48 at ¶ 3; ECF No. 47 at ¶ 3. And so, there is also no dispute that Hippocratic paid for the equipment purchased for Pro Green's use and that Hippocratic continues to pay for this equipment. ECF No. 47 at ¶¶ 8, 36; ECF No. 48, Counterclaims at ¶ 9.

On January 31, 2023, Hippocratic delivered a cashier's check in the amount of $2,540,000 to Mr. Pesce to satisfy the promissory note under the SPA. ECF No. 47 at ¶ 51. Mr. Pesce states that he returned this check because he has rescinded the SPA. ECF No. 49 at ¶ 51.

### Mr. Pesce's Counterclaims

Mr. Pesce asserts three counterclaims in this case. First, Mr. Pesce asserts a claim for breach of contract against Hippocratic and TC Maryland, Inc. based upon recission of the SPA. ECF No. 48, Counterclaims at ¶¶ 86-99. In this counterclaim, Mr. Pesce alleges that he performed his obligations under the SPA and Hippocratic breached the SPA by: (1) "failing to provide sufficient funds to loan to Pro Green to fund working capital in accordance with proforma budgets and working capital estimates;" (2) "failing to secure MMCC approval of PGMM as manager and of the Management Agreement based upon Hippocratic Growth's undisclosed issues with the MMCC that pre-dated the SPA;" (3) failing to "'use its reasonable best efforts' to cause its management company to operate Pro Green 'in the ordinary course of business and consistent with all Cannabis Laws' and the terms of its management agreement, by failing to become approved as manager;" and (4) "failing to purchase equipment and deliver title to such equipment to Pro Green." *Id.* at ¶¶ 90-93. In addition, Mr. Pesce alleges that he "went through the proper process, per the SPA, to rescind the SPA," but, he was thwarted in his effort to rescind the SPA by Hippocratic's "overt acts," including the "filing of multiple lawsuits, . . .

---

[4] On October 13, 2023, Plaintiffs filed a status report alleging that Mr. Pesce has continued to operate Pro Green to the present, accumulating net profits of $230,000 per month. ECF No. 52.

securing of a sham Confession of Judgment, and their wrongful attempts to enforce the sham Confession of Judgment through improper writs of garnishment." *Id.* at ¶¶ 95-97.

Second, Mr. Pesce asserts a counterclaim for declaratory judgment against Hippocratic and TC Maryland to recognize his recission of the SPA. *Id.* at ¶¶ 100-07. Specifically, Mr. Pesce seeks a declaratory judgment that, among other things, states that: (1) the SPA has been rescinded and (2) Hippocratic "must tender back to Michael Pesce all stock in TC Maryland that it received from [Mr. Pesce] pursuant to the Stock Purchase Agreement." *Id.* at ¶¶ 32-33. Lastly, Mr. Pesce asserts a counterclaim for declaratory judgment against Hippocratic and TC Maryland regarding the transfer of Pro Green's license. *Id.* at ¶¶ 108-114. In this counterclaim, Mr. Pesce seeks a declaratory judgment stating that he is the sole shareholder of TC Maryland and that Pro Green's license should be transferred to TC Maryland, because the SPA has been rescinded. *Id.* at ¶¶ 110, 113.

### B.     Relevant Procedural Background

Hippocratic initially commenced this action in the Circuit Court for Baltimore County on January 11, 2022. ECF No. 1. On January 13, 2022, Mr. Pesce removed the case to this Court. *Id.*

After Mr. Pesce moved to dismiss this matter, or, alternatively, for summary judgment in his favor, the Court issued a memorandum opinion and order denying that motion on October 6, 2022. ECF No. 33. On November 7, 2022, Mr. Pesce answered the complaint and asserted two counterclaims against Hippocratic. ECF No. 34.

On December 20, 2022, Hippocratic filed a motion to dismiss Mr. Pesce's counterclaims, and a memorandum in support thereof, pursuant to Fed. R. Civ. P. 12(b)(6). ECF Nos. 41 and 41-1. On January 10, 2023, Mr. Pesce filed a response in opposition to Hippocratic's motion to dismiss. ECF Nos. 42 and 42-1. Hippocratic filed a reply brief on January 17, 2023. ECF Nos. 43 and 43-1.

On March 29, 2023, Hippocratic filed a motion for leave to file an amended complaint, pursuant to Fed. R. Civ. P. 15(a). ECF No. 44. Hippocratic filed an amended complaint on September 20, 2023, by leave of the Court. On October 4, 2023, Mr. Pesce answered the amended complaint and asserted three counterclaims against Hippocratic and TC Maryland,

based upon the alleged rescission of the SPA.  ECF No. 48.

On October 27, 2023, Hippocratic filed a renewed motion to dismiss Mr. Pesce's counterclaims, and a memorandum in support thereof, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 54.  Mr. Pesce filed a response in opposition to that motion on November 10, 2023.  ECF No. 55.  Hippocratic filed a reply brief on November 17, 2023.  ECF No. 57.

Hippocratic's motion to dismiss having been fully briefed, the Court resolves the pending motion.

### III.    LEGAL STANDARDS

#### A.    Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when "the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  When evaluating the sufficiency of a plaintiff's claims under Fed. R. Civ. P. 12(b)(6), the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  *Nemet Chevrolet, Inc. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Lambeth v. Bd. Of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005) (citations omitted).  But, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ."  *Nemet Chevrolet*, 591 F.3d at 255.  And so, the Court should grant a motion to dismiss for failure to state a claim if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *GE Inv. Priv. Placement Partners II, L.P. v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989)).

### B. Breach Of Contract Claims And Recission

In Maryland, the elements of a breach of contract claim are: (1) a contractual obligation and (2) a material breach of that obligation. *Allstate Ins. Co. v. Warns*, No. 11-1846, 2012 WL 681792, at *10 (D. Md. Feb. 29, 2012) (citations omitted). And so, a plaintiff must plead the existence of a "contractual obligation, breach, and damages" to state a plausible breach of contract claim. *Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*, No. 16-3431, 2018 WL 1471682, at *8 (D. Md. Mar. 23, 2018) (citations omitted).

Maryland courts also have long recognized that:

> When a contracting party is displeased with the other's performance he may follow either of two alternative courses of action, if under the facts they are open to him: (l) he can reaffirm the existence of the contract and seek specific performance when appropriate or claim damages for its breach, or (2) he can repudiate the contract altogether and request rescission.

*Lazorcak v. Feuerstein*, 327 A.2d 477, 480 (Md. 1974) (citing *Kemp v. Weber*, 24 A.2d 779, 780 (Md. 1942)). With regards to the recission of a contract, a failure of a party to perform its part of a contract, "though it may give rise to a suit for damages, does not in and of itself act to rescind that contract." *Id.* at 481. Rather, the general rule is that the party seeking rescission must "indicate to the other party at least the intent to restore the parties to the relative positions which they would have occupied if no such contract had ever been made, and this as soon as the disenchanted party learns of the facts." *Id.* (citing *Kemp*, 24 A.2d at 780).

The offer of restoration must "demonstrate an unconditional willingness to return to the other party both the consideration that was given by that party and any benefits received under the contract." *Id.* (citations omitted). In addition, a party seeking recission "must demonstrate he acted promptly after discovery of the ground for recission," and "[h]e must also show that he tendered to [the other party] all consideration and benefits received under the contract immediately after notice of the ground for recission." *Finch v. Hughes Aircraft Co.*, 469 A.2d 867, 894 (Md. Ct. Spec. App. 1984) (citations omitted). But, "if a party who knows the facts which would justify rescission, does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind." *Lazorcak*, 327 A.2d at 481.

Lastly, Maryland law recognizes that there are limited circumstances when an aggrieved party that rescinds a contract is excused from restoring the other party to its pre-contract state. *Id.* at 482. Specifically, recission without restoration may be appropriate if:

> (1) the performance by the one against whom recission is sought has become worthless, or (2) the respondent has prevented its return, or (3) the performance conferred only an intangible benefit upon the complainant, or (4) only a promise was given, or (5) the complainant can properly retain it irrespective of the voidable transaction, or (6) it is in possession of or is subject to the order of a person having a right superior to the complainant, or (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that recission be granted (sometimes with a monetary substitute for restoration).

*Funger v. Somerset*, 223 A.2d 168, 174 (Md. 1966). And so, what is essential is that equity between the parties is restored according to two fundamental principles: "that he who seeks equity must do equity and that the rescinder must not be unjustly enriched." *Id.* at 173.

## IV. LEGAL ANALYSIS

Hippocratic has moved to dismiss Mr. Pesce's three counterclaims in this case, based upon the recission of the SPA, upon the grounds that Mr. Pesce: (1) waived the right to rescind the SPA; (2) benefited from, and attempted to enforce, the SPA while claiming a right to rescind the agreement; and (3) failed to comply with the prerequisites to recission under the SPA. ECF No. 41 at ¶¶ 1-3; *see also* ECF No. 54-1 at 3-4. Mr. Pesce counters that dismissal of his counterclaims is unwarranted, because he has neither recognized the ongoing validity of the SPA, nor impermissibly accepted benefits from the SPA. ECF No. 42-1 at 1; *see also* ECF No. 55-1. Mr. Pesce also argues that the Court should not dismiss his counterclaims, because: (1) the Supreme Court of Maryland's decision in *Lazorcak v. Feuerstein* is distinguishable from this case; (2) his failure to immediately return the benefits and consideration provided for by the SPA does not constitute a waiver of his right to rescission; (3) he has tendered funds to Hippocratic; (4) Hippocratic's actions indicate that it assented to the recission of the SPA; and (5) he was unable to immediately return the funds to Hippocratic due to the "tortious interference" of Hippocratic in his business dealings. ECF No. 42-1 at 20-24; ECF No. 48, Counterclaims at ¶¶ 21-23, 25, 102 and 103. And so, Mr. Pesce requests that the Court deny Hippocratic's motion to dismiss.

For the reasons that follow, a careful reading of Mr. Pesce's counterclaims shows that he has waived the right to rescind the SPA, by continuing to accept the benefits of the SPA and recognizing the ongoing validity of that agreement, after becoming aware of the grounds for rescission.  And so, the Court: (1)  GRANTS Hippocratic's motion to dismiss Mr. Pesce's counterclaims and (2) DISMISSES these counterclaims.  Fed. R. Civ. P. 12(b)(6).

### A.     Mr. Pesce Has Waived The Right To Rescind The SPA

Hippocratic persuasively argues in its motion to dismiss that Mr. Pesce cannot prevail on his counterclaims for breach of contract and declaratory judgment, because he has waived the right to rescind the SPA.  Maryland courts have long recognized that:

> When a contracting party is displeased with the other's performance he may follow either of two alternative courses of action, if under the facts they are open to him: (l) he can reaffirm the existence of the contract and seek specific performance when appropriate or claim damages for its breach, or (2) he can repudiate the contract altogether and request rescission.

*Lazorcak*, 327 A.2d at 480 (citing *Kemp*, 24 A.2d at 780).  A party seeking to rescind a contract "must demonstrate he acted promptly after discovery of the ground for recission," and "[h]e must also show that he tendered to [the other party] all consideration and benefits received under the contract immediately after notice of the ground for recission."  *Finch*, 469 A.2d at 894 (citations omitted).  And so, if the contract is rescinded, the aggrieved party must return its benefits and receive back its expenditures.  *Lazorcak*, 327 A.2d at 481.

Relevant to this dispute, Maryland courts have recognized that that, "if a party who knows the facts which would justify rescission, does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind."  *Id.*  And so, Mr. Pesce cannot prevail on his recission-based counterclaims in this action, if the factual allegations in the counterclaims show that he continued to receive the benefits of the SPA and to recognize the validity of the SPA, after becoming aware of the grounds for rescinding the SPA.  *Id.*

In this case, Mr. Pesce asserts counterclaims for breach of contract and declaratory judgment, which are premised upon his ability to rescind the SPA.  ECF No. 48, Counterclaims

at ¶¶ 86-114. But the factual allegations in these counterclaims, taken as true, show that Mr. Pesce waived the right to rescind the SPA for several reasons.

First, the factual allegations in the counterclaims show that Mr. Pesce continued to retain the benefits under the SPA after becoming aware of the grounds for rescinding that agreement. In this regard, there is no dispute among the parties that Mr. Pesce discovered the facts providing the grounds for rescinding the SPA in January 2022. Notably, Mr. Pesce sent a letter to Hippocratic on January 24, 2022, that provides "formal notice" that the SPA is terminated pursuant to Section 7.02(b) of that agreement, because of Hippocratic's alleged breaches of the SPA. ECF No. 41-4; ECF No. 48, Preliminary Statement at ¶ 13 and Factual Allegations at ¶ 50. And so, Mr. Pesce acknowledges in his counterclaims that he was aware of the facts that would cause him to seek to rescind the SPA on January 24, 2022.

The factual allegations in the counterclaims also make clear that Mr. Pesce continued to receive the benefits provided to him under the SPA after January 24, 2022. In this regard, there is no dispute in this case that Mr. Pesce continued to operate Pro Green after January 24, 2022. ECF No. 41-1; ECF No. 48, Factual Allegations at ¶¶ 34, 35. Mr. Pesce also acknowledges in the counterclaims that he has continued to use the equipment purchased by Hippocratic for the Pro Green. ECF No. 48, Factual Allegations at ¶ 34. There is also no dispute that Mr. Pesce has retained all profits of Pro Green. *See generally*, ECF Nos. 54 and 55. And so, the factual allegations in this case show that Mr. Pesce continued to reap the benefits of operating Pro Green after he alleges that he rescinded the SPA.

Second, the undisputed factual record before the Court also shows that Mr. Pesce continued to recognize the validity of the SPA after January 24, 2022. It is undisputed that, on October 20, 2022, approximately nine months after becoming aware of the grounds for recission, Mr. Pesce's counsel sent a letter to Hippocratic inquiring about, among other things, whether Hippocratic intended to deposit into escrow the remaining sum owed under that agreement to pay off the price purchase promissory note for the SPA–approximately $2.6 million. ECF No. 41-3. As Mr. Pesce correctly observes, this letter states that he "continues to maintain that the SPA and all related instruments have been terminated and are subject to recission," which is a position that Mr. Pesce also takes in this litigation. *Id.* But, the Court agrees with Hippocratic that Mr. Pesce's actions in seeking to recover the escrow deposit called for under the SPA, approximately

nine months after allegedly rescinding that agreement, is at odds with a reservation of the right to rescind that agreement.

Lastly, there is also no dispute that Mr. Pesce failed to immediately return Hippocratic's consideration upon becoming aware of the grounds to rescind the SPA, further casting doubt on Mr. Pesce's recission-based counterclaims. Maryland Courts have long held that a party seeking recission "must also show that he tendered to [the other party] all consideration and benefits received under the contract *immediately* after notice of the ground for recission." *Finch*, 469 A.2d at 894 (citations omitted) (emphasis supplied). It is undisputed in this case that the parties reached an agreement in principle for a settlement in early 2022, but Mr. Pesce lacked the funds to immediately return Hippocratic's consideration at that time. ECF No. 47 at ¶¶ 34-35; ECF No. 48 at ¶¶ 14, 20, n.4. And so, there is no dispute that Mr. Pesce did not immediately return Hippocratic's consideration after having become aware of the ground for rescinding the SPA.

Mr. Pesce, nonetheless, argues that he has not waived the right to rescind the SPA, because he expressed an "unconditional willingness" to return Hippocratic's consideration and Hippocratic has interfered with his ability to do so. ECF No. 48 at ¶¶ 96-98, 102. This argument is not persuasive.

While Maryland law recognizes that there are limited circumstances when an aggrieved party that rescinds a contract is excused from restoring the other party to its pre-contract state, including that the respondent has prevented the return of the consideration, the factual allegations in the counterclaims do not plausibly show that Hippocratic prevented the return of the consideration at issue here. *See Funger*, 223 A.2d at 174. In this regard, Mr. Pesce alleges that Hippocratic interfered with his ability to return the consideration, because Hippocratic commenced this case and other litigation before the Circuit Court for Frederick County. ECF No. 48 at ¶ 97. But, there are no facts in the counterclaims to explain *how* the commencement of these cases prevented Mr. Pesce from immediately returning Hippocratic's consideration. *See generally*, ECF No. 48. Rather it is clear from the pleadings in this case that Mr. Pesce did not immediately return Hippocratic's consideration because he simply lacked the funds to do so. *Id.*, Preliminary Statement at ¶ 14.

Mr. Pesce's remaining arguments against dismissing his counterclaims are equally unavailing. Mr. Pesce also alleges in his counterclaims that: (1) Hippocratic's actions indicate

that it assented to the recission of the SPA and (2) he was unable to immediately return the funds to Hippocratic due to the "tortious interference" of Hippocratic in his business dealings. *Id.* at ¶¶ 14-25; 99 and 103.  But, again, the factual allegations in the counterclaims do not show that Hippocratic assented to the recission of the SPA, by "taking positions adverse to Pro Green" and filing this and other litigation.  *Id.* at ¶¶ 21-24 and 99.

Rather, as Hippocratic correctly observes, the pleadings in this matter make clear that Hippocratic has sought either specific performance of the SPA, or to recover monetary damages for Mr. Pesce's alleged breach of that agreement, during the course of this litigation.  ECF Nos. 6 and 47.  Because Hippocratic cannot both rescind the SPA and seek damages under that agreement, Mr. Pesce's argument that Hippocratic assented to the recission of the SPA is belied by the factual record in this case.

Mr. Pesce's argument that he did not waive the right to rescind the SPA, because Hippocratic tortiously interfered with his ability to rescind that agreement is also problematic.  ECF No. 48 at ¶ 25.  As discussed above, Mr. Pesce alleges in his counterclaims that Hippocratic improperly interfered with his ability to raise funds to return Hippocratic's consideration.  *Id.*  To prove a claim for intentional interference with contractual or business relations, Mr. Pesce must show: "(1) intentional and [willful] acts; (2) calculated to cause damage to [him] in [his] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."  *See Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010) (quoting *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003)).

But, the counterclaims lack factual allegations to support any of these elements, especially with regards to how the litigation brought by Hippocratic was calculated to cause damage to Mr. Pesce's business and to prevent the return of the consideration.  *See generally*, ECF No. 48.  Given this, Mr. Pesce's tortious interference claim is also unsupported.[5]

Because the factual allegations in Mr. Pesce's counterclaims, taken as true, show that he waived the right to rescind the SPA after becoming aware of the grounds for recission, he fails to

---

[5] Because the Court concludes that the factual allegations in the counterclaims show that Mr. Pesce waived the right to rescind the SPA, the Court does not address whether Mr. Pesce satisfied the prerequisites to recission under the SPA.

state plausible claims for breach of contract and declaratory judgment based upon recission in this case.  And so, the Court must: (1) GRANT Hippocratic's motion to dismiss and (2) DISMISS Mr. Pesce's counterclaims.  Fed. R. Civ. P. 12(b)(6).

## V.    CONCLUSION

In sum, a careful reading of Mr. Pesce's counterclaims shows that he does not state plausible rescission-based counterclaims for breach of contract and declaratory judgment in this action, because he has waived the right to rescind the SPA.  And so, for the foregoing reasons, the Court:

1. **GRANTS** Hippocratic's renewed motion to dismiss (ECF No. 54);

2. **DISMISSES** Mr. Pesce's counterclaims; and

3. **DENIES-as-MOOT** Hippocratic's motion to dismiss (ECF No. 41).

A separate Order shall issue.

   **IT IS SO ORDERED.**

                                                                s/Lydia Kay Griggsby
                                                                LYDIA KAY GRIGGSBY
                                                                United States District Judge